# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

|  |  |
|---|---|
| v. | **REPORT AND** |
|  | **RECOMMENDATION** |
|  | **03-CR-6142** |

JOHN CRUZ,

Defendant.

## Preliminary Statement

By Order of Judge David G. Larimer, dated September 30, 2003, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. §636(b)(1)(A)-(B). (Docket #3). Currently before the Court are motions by defendant John Cruz (hereinafter Cruz) to suppress certain evidence the government intends on using at trial. (Docket #125, 159, 194). The Government has filed papers in opposition to the motions. (Docket #152, 175, 196). A suppression hearing was held on May 2, 2005 and continued on May 30, 2006 and thereafter the parties filed additional briefing. The following is my Report and Recommendation as to the defendant's motions.

## Factual Background

A.  Identification Procedures: At the May 2, 2005 hearing, a government witness testified regarding identification procedures used by law enforcement in which Cruz was identified by third party witnesses. Rochester Police Investigator Scott Deming testified

that on nine occasions during 2003 and 2004, he showed a photo array containing John Cruz's photograph to various witnesses. <u>See</u> Transcript of May 2, 2005 Suppression Hearing [hereinafter "T1"] at 4-7 (Docket #242); <u>see also</u> Government's Exhibits Nos. 1-9. The array Deming utilized contained six photographs and was digitally created using the police department's "Morris System" program. (T1 at 24-25). John Cruz's photograph was placed in position number five.

Deming first showed the array to a witness in a conference room at the United States Attorney's Office in the Rochester Federal Building on October 23, 2003. (T1 at 7). Agent John Hayes of the Bureau of Alcohol, Tobacco and Firearms ("ATF") was also present for the display. (T1 at 8). According to Deming, he asked the witness if he/she recognized any of the six photographs in the array. The witness responded by identifying photograph #5 as "J.J." (T1 at 8). The witness circled the number 5, wrote "J.J." underneath the photograph and signed the form. (T1 at 8). This same witness was inadvertently shown the photo array again at the U.S. Attorney's Office on December 1, 2003 with Deming, Investigator Tom Janus and Officer Brennan present and responded in the same manner by designating photograph number 5. (T1 at 16).

Deming testified that he showed the photo array to another witness at their residence on November 4, 2003. (T1 at 9). Deming asked whether the witness recognized any of the photographs and the

2

witness identified photograph #5 as "J.J." (T1 at 10). The witness circled the number of the photograph and wrote the name below it. (T1 at 10). Then the witness signed and dated the bottom of the photo array. (T3 at 8).

Deming showed the photo array to a third witness in a conference room at the U.S. Attorney's Office on November 20, 2003. (T1 at 10). Deming asked whether the witness recognized any of the six photographs and the witness identified photograph #4 as Puertico and photograph #5 as "J.J." (T1 at 11-12). The witness circled the numbers of those photographs and wrote the names above them. (T1 at 10).

On December 18, 2003 and May 24, 2004, Deming and Hayes inquired of two other witnesses regarding the photo array in the conference room at the U.S. Attorney's Office. (T1 at 14). The witnesses both stated that they recognized photograph #5 as "J.J." and made notations on the form accordingly. (T1 at 15-17).

On June 7, 2004, the array was shown to another witness at the ATF Office in Rochester, New York. The witness said that he/she recognized photograph #5 as "J.J." and so indicated on the form. (T1 at 18). The witness, a confidential informant, also told Deming and Hayes that he had purchased marijuana from J.J. in the past and recalled him driving a pearl Cadillac truck. (T1 at 58). Deming testified he later confirmed the accuracy of this information. (T1 at 59).

3

On August 20, 2004, the array was shown to another witness in the conference room at the U.S. Attorney's Office.   (T1 at 19). Deming, Hayes and the witness's attorney were present.   When asked if he/she recognized anyone in the array, the witness stated that he/she recognized the person in photograph #4, but could not recall his name.   The witness also identified photograph #5 as "J.J." and stated that they had known each other for a "couple of years."   (T1 at 20; 66).   Deming instructed the witness to circle both numbered photographs, write the name beside the photo he recognized and sign the form.

On December 20, 2004, Deming and Hayes showed the array to a witness in the conference room at the U.S. Attorney's Office.   (T1 at 20).   Also present was the witness's attorney.   The witness identified photograph #5 as "J.J." and completed the form accordingly.   (T1 at 21).

Deming testified that no one in the room at any of the viewings suggested or indicated to any witness in any way which photograph they should choose.   (T1 at 9).

B.   Searches of 54 Joseph Place: Law enforcement conducted two separate searches of 54 Joseph Place in connection with this investigation.   The first occurred on February 1, 2001 and was the focus of testimony adduced at a suppression hearing conducted by this Court on May 30, 2006.   The second search occurred on April 8, 2004 and was conducted pursuant to a search warrant issued by this

Court.  As to this second search, all counsel agreed to rely on their written submissions for the Court's decision regarding the existence of probable cause to support the search warrant.

The February 1, 2001 Search: The government presented the testimony of Chief Parole Officer Philip Overfield at the suppression hearing.  Officer Overfield testified that his office was responsible for supervising a parolee, Victor Capeles, who resided at 54 Joseph Place, Rochester, New York. See Transcript of May 30, 2006 Suppression Hearing [hereinafter "T2"] at 5-6 (Docket #318).  On February 1, 2001, Capeles's parole officer learned that Capeles had recently tested positive for cocaine use, was drinking heavily and causing problems in the house where he was living.  At approximately 8:00 p.m. Overfield and two other parole officers went to the residence to investigate the situation.  (T2 at 6-7).  The officers were dressed in shirts and ties and Overfield carried a firearm and handcuffs beneath his jacket. (T2 at 32).  The parole officers accompanying him also wore bullet proof vests and badges around their necks. (T2 at 33-34).

When they arrived at the house, Mr. Capeles's sister Adelaide (who is also John Cruz's mother), answered the door and invited them inside. (T2 at 7).[1]  In further support of their entry into

_____

[1] On cross-examination, Overfield stated that he did not recall the exact conversation that occurred on the doorstep, only that he remembered "a positive response" from her, and would not have entered the house without her permission. (T2 at 46-48, 87).

the home, the Government attached to its motion papers an affidavit from Officer Overfield and a signed copy of Victor Capeles's Conditions of Release.  <u>See</u> Affidavit of Philip Overfield (Docket #323) and Exhibit A attached thereto.  In signing the form, Capeles represented that he would "permit the search and inspection of [his] person, residence and property" by his parole officer.  <u>See</u> Exhibit A at ¶ 4.

Once the officers were inside the house, Adelaide told them that her brother was not at home.  She gave them permission to search his room, which they did.  Adelaide also told the parole officers that Victor was at her sister's house down the street. (T2 at 7-8).

Upon obtaining the information about the location of Capeles's whereabouts, the officers went to 40 Joseph Place where Mr. Capeles's other sister, Sonya, answered the door. (T2 at 11).  She motioned for the officers to enter and pointed to a room where Officer Overfield saw Victor Capeles lying on a mattress on the floor surrounded by beer containers. (T2 at 11-12, 60).  Overfield arrested Victor for consuming alcohol in violation of his probation and found a handgun on the floor next to the mattress.  (T2 at 12). Sonya then gave the officers consent to search the entire residence.  (T2 at 12).  The officers found a loaded handgun, ammunition, and 40 small bags of marijuana in a refrigerator. (T2 at 13).  Sonya told the officers that Victor had been staying

intermittently at both sisters' houses, so Overfield returned to 54 Joseph Place with a uniformed police officer and asked Adelaide if they could search her house in light of what they had found at Sonya's. (T2 at 13-15). Adelaide said yes and motioned for the officers to enter. (T2 at 15, 65). During the search, the officers found ammunition in the attic and marijuana in a basement refrigerator. (T2 at 17-19). They were also alerted to the presence of other firearms by Adelaide. (T2 at 17-18, 27). During the course of the search, the officers found another refrigerator in the basement that was padlocked and had a strong odor emanating from it. (T2 at 21).[2] Adelaide said she did not know who owned the refrigerator or what was inside it. (T2 at 22). She said she did not have a key for the lock and told the officers they could break the lock and open it. (T2 at 22, 81).

All of these conversations were conducted in English, but according to Overfield, Adelaide began to claim that she did not understand what was being said, so Overfield had a Spanish-speaking officer, Jose Munoz, obtain her written consent to open the locked refrigerator. (T2 22-24; 92); see Government's Exhibit 15. The officers then broke the lock and found over six pounds of marijuana inside. (T2 at 26). At no time during the search did Adelaide

_____

[2] In a supplemental affidavit submitted after the hearing, Officer Overfield stated that he personally smelled "a strong odor of marijuana." See Supplemental Affidavit of Philip Overfield at ¶ 3. (Docket #323).

tell the officers to stop searching her home.  (T2 at 28).

The April 8, 2004 Search: On April 8, 2004 I signed a search warrant based upon an affidavit submitted by ATF Special Agent John H. Hayes.  The affidavit set forth detailed historical information about a long term drug distribution operation being conducted out of 54 Joseph Place.  The affidavit relied on multiple sources to set forth drug distribution activities by Cruz and his associates out of the Joseph Place dwelling over a period of years, including a January 5, 2004 "hand to hand" purchase of cocaine (arranged by Cruz) to a confidential informant who was operating under the control of law enforcement.  Hayes's affidavit described surveillance, informant and business information that confirmed Cruz's current presence within and in connection to 54 Joseph Place.  The search warrant was executed on the morning of April 9, 2004 and various items of contraband, including firearms and ammunition were seized.

## Discussion

1. Suppression of the Results of the Photo-Arrays:  In his motion to suppress the identifications, defense counsel claims that the identification procedures were "improperly made," "unduly suggestive" and that materials regarding the identifications have been excessively redacted.  See Affirmation of Lawrence L. Kasperek, Esq. ¶ 18-19 (Docket #194).

8

The Due Process Clause of the Fifth Amendment entitles individuals accused of crimes to protection against the use of evidence derived from unreliable identification procedures, including photographic displays. Moore v. Illinois, 434 U.S. 220, 227 (1977); Dunnigan v. Keane, 137 F.3d 117, 128 (2d Cir. 1998). In general, a pretrial photographic identification procedure violates due process if the procedure is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Curry v. Burge, 2004 WL 2601681, *20 (S.D.N.Y. Nov. 17, 2004), quoting Simmons v. United States, 390 U.S. 377, 384 (1968).

Having examined the photographic array used in all nine identification procedures, I find that the array is not impermissibly suggestive. Indeed, the other men pictured in the array have characteristics similar to Cruz in terms of race, age and facial hair. See United States v. Thai, 29 F.3d 785, 808-809 (2d Cir. 1994)(where photo array contained people of the same sex, race, hair color and approximate age, the array was not unduly suggestive). In addition, there is no evidence that any of the identifying witnesses provided law enforcement officers with any description of "J.J." prior to identifying him in the array. Thus, there is no basis to believe that Investigator Deming chose photographs that would be more likely to elicit an identification of Cruz. See United States v. Taveras, 1995 WL 600860, *5

(S.D.N.Y. Oct. 11, 1995)(the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit." (internal quotations and citations omitted).

For these reasons, it is my Report and Recommendation that Cruz's motion to suppress the results of the pretrial identification procedures be **denied**.

2. February 2, 2001 Search of 54 Joseph Place: As to the search of 54 Joseph Place on February 1, 2001, there are two distinct legal issues that have been raised.  First, the Government challenges Cruz's "standing" to contest the search of the locked refrigerator in the basement in which six pounds of marijuana were found. See Docket #323 at page 23-24.  Second, because resolution of the "standing" issue as to the locked refrigerator, does not effect the legality of the officers' right to search of the rest of the residence, the Court must also determine whether there was a valid third party consent or some other exception to the Fourth Amendment's warrant requirement to justify the search.

Search of the Locked Refrigerator: As set forth earlier, in the basement of 54 Joseph Place, officers discovered a refrigerator locked shut with a padlock that had a "strong odor" emanating from inside.  Officers cut the padlock with a bolt cutter during the

search and found over six pounds of marijuana inside.  Pursuant to a direction from this Court, the defendant submitted an affidavit setting forth facts demonstrating that he had a legitimate expectation of privacy in the premises and/or places searched.  The affidavit included a copy of the deed dated April 18, 1997 showing that Cruz was the owner of 54 Joseph Place.  <u>See</u> Affidavit of John Cruz (Docket #159).  However, in his affidavit Cruz concedes that he did not live at 54 Joseph Place and that his primary residence was at 98 Herald Street.  According to Cruz, he rented the house at 54 Joseph Place to his mother who paid him rent, but he was an occasional overnight guest who maintained a "regular presence in the home" during this period of time.  <u>See</u> Cruz Aff. ¶ 4. Additionally, Cruz states that he kept important personal papers, clothes and money in a bedroom of the house.  <u>Id.</u> at ¶ 6-8.  Cruz makes no mention of the locked refrigerator in his affidavit.

It is well settled that a person challenging the constitutionality of a search must show that he possesses a legitimate expectation of privacy in the particular area searched in order for a Fourth Amendment challenge to be allowed.  <u>See</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 143 (1978).  In order to establish Fourth Amendment "standing", a defendant must show 1) that he personally sought to preserve the area searched as private and 2) that his expectation of privacy in the location was objectively reasonable.  <u>Smith v. Maryland</u>, 442 U.S. 735, 740 (1979); <u>United</u>

States v. Chuang, 897 F.2d 646, 649 (2d Cir. 1990). A defendant's Fourth Amendment rights are violated only when the challenged conduct invades that party's legitimate expectation of privacy. United States v. Payner, 447 U.S. 727, 731 (1980).

Ownership of premises alone does not automatically confer standing. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of [the] inquiry." United States v. Salvucci, 448 U.S. 83, 91 (1980)(citation omitted). Other factors to be considered include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has demonstrated a subjective expectation of privacy, and whether he took precautions to maintain his privacy. Id. See Shamaeizadeh v. Cunigan, 338 F.3d 535, 544-45 (6th Cir. 2003) (property owner who lived in one story house with a basement lacked standing to contest search of basement because he rented it to tenants and did not have a reasonable expectation of privacy there).

Applying these considerations, I find that despite his ownership of the property and occasional overnight visits, Cruz did not demonstrate an expectation of privacy sufficient to contest the search of the basement refrigerator at 54 Joseph Place. It is undisputed that Cruz did not live at the residence, rather he

rented the house and therefore, did not have the right to exclude others from the home.   Courts are reluctant to extend blanket standing to occasional overnight guests such as Cruz.   See e.g United States v. Rackley, 742 F.2d 1266, 1270 (11th Cir. 1984)(occasional overnight guests would only have an expectation of privacy in the guest bedroom; since guests could not demonstrate any valid expectation of privacy in the garage, let alone garbage bags contained therein, court rejected their motions to suppress for lack of standing); United States v. Gerena, 662 F.Supp. 1260, 1262 (D. Conn. 1987)(defendant was an occasional overnight guest in apartment, had a key and kept clothing and other personal effects there, but court found no standing to contest search because he did not reside there, could only stay there with the tenant's consent and had no right to exclude others).

Cruz's ability to establish standing is also hampered by the fact that, although given the opportunity, he has never claimed any privacy interest in the basement, let alone any ownership interest in the locked refrigerator or its contents.   United States v. Manbeck, 744 F.2d 360, 374 (4th Cir. 1984)("the privacy interest that must be established to support standing is an interest in the area searched"); U.S. v. Nabors, 761 F.2d 465, 469 (8th Cir. 1985)(motion to suppress denied for lack of standing where defendant never claimed ownership of the drugs seized at the house where he was an occasional visitor).   Significantly, Cruz has made

no claim to owning the refrigerator, controlling or using the refrigerator, locking the refrigerator or having the key to the refrigerator. See United States v. Barry, 853 F.2d 1479, 1482 (8th Cir. 1988)(expectation of privacy interest in locked briefcase preserved where defendant's possession of the key to it "clearly demonstrated his intent to control the suitcase and its contents); United States v. Presler, 610 F.2d 1206, 1213-14 (4th Cir. 1979)(noting that "[t]he very act of locking them and retaining either the key or the combination to the locks on the two briefcases was an effective expression of the defendant's expectation of privacy); United States v. Chen, 629 F.Supp. 263, 270 (S.D.N.Y. 1986)(finding that the defendant had a privacy interest in a locked safe inside a locked closet in the open stairwell of the house he shared with his in-laws; both the defendant and his in-laws had keys to the closet and knew the combination to the safe, and the defendant admitted the safe was his). The burden of proving the existence of a reasonable expectation of privacy rests with the defendant. United States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991). Cruz cannot distance himself from any connection to the locked refrigerator while simultaneously arguing that he had a reasonable expectation of privacy in its contents.

For these reasons, I find that Cruz has failed to demonstrate that he had any reasonable expectation of privacy in the locked

refrigerator. Accordingly, it is my Report and Recommendation that his motion to suppress the marijuana seized on February 1, 2001 from the locked refrigerator at 54 Joseph place be **denied**.

Consent to search 54 Joseph Place: I turn now to whether the defendant's Fourth Amendment rights were violated with respect to the search of the rest of the house on February 1, 2001. On this issue, the government does not dispute Cruz's reasonable expectation of privacy. Consequently, the burden is on the government to demonstrate that the search was within one of the exceptions to the requirement of a warrant. United States v. Perea 986 F.2d 633, 639 (2d Cir. 1993)(If "a privacy interest is established [by the defendant], the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement.").

One exception to the warrant requirement is a consent search. "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." United States v. Isiofia, 370 F.3d 226, 230-31 (2d Cir. 2004). "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) quoting United States v. Sanchez, 32 F.3d 1330, 1334 (8th Cir. 1994). "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search."

15

United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).

Cruz does not deny that as a resident of the home, his mother had authority to give the officers consent to search the house. Instead, Cruz contends that Overfield and the two parole officers initially entered the home without asking Ms. Capeles's permission and later coerced her consent to the search by threatening her with jail. Cruz further contends that Ms. Capeles's consent was unknowing because of her inability to understand English and that her written consent is invalid because it was obtained after the search occurred.

Initially I note that although the government has the burden of proof to demonstrate a valid consent, the only proof presented at the hearing on the issue of consent was the testimony of Officer Overfield and Officer Jose Munoz. Ms. Capeles did not testify at the hearing or provide an affidavit. Thus, to the extent Cruz argues that Ms. Capales was subjected to improper coercion or did not understand English sufficiently to give a valid consent to search, my decision as to consent is necessarily limited to and based upon the proof presented.

I find that the record supports a finding that Ms. Capeles's consent was voluntarily given. Officer Overfield testified that Ms. Capeles did consent to the search of her home and signed the written consent form before the refrigerator lock was broken and I found his testimony to be credible. Despite the fact that the

officers displayed badges and carried firearms, there is no indication that Ms. Capeles was intimidated into giving consent. I credit Officer Overfield's testimony that Ms. Capeles gave a "positive response" both verbally and physically when he asked for her permission to enter and search the residence. There is also undisputed testimony that Ms. Capeles cooperated with the officers and alerted them to the location of other firearms within the house. Finally, Ms. Capeles signed a written consent to search form, which was read to her in Spanish by Officer Munoz and there is no evidence that her signature was not given voluntarily. See Government's Exhibit 15. In sum, I find that her consent to the search of the home was knowing and voluntary.

Based on the totality of circumstances as adduced during the suppression hearing, it is my Report and Recommendation that Cruz's motion to suppress evidence seized during the February 1, 2001 search of 54 Joseph Place be **denied**.[3]

3. The April 8, 2004 Search Warrant: In his supplemental motion, Cruz alleges deficiencies with regard to Agent John Hayes' affidavit in support of the April 8, 2004 search warrant for 54 Joseph Place. Specifically, Cruz alleges that much of the information in the application was stale. See Supplemental Affidavit of Herbert J. Lewis, Esq. at ¶ 8-19 (Docket #159). Cruz

---

[3] Having determined that Ms. Capales gave a valid consent, I need not and do not ajudicate the alternative legal arguments made by the government to justify the February 1, 2001 search.

claims the defects in the warrant require suppression.

Probable cause to search a place exists if the issuing judge finds a "fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Ponce, 947 F.2d 646, 650 (2d Cir. 1991), quoting Illinois v. Gates, 462 U.S. 213, 238 (1983). In determining the existence of probable cause, courts must apply a totality of the circumstances analysis. Id.

I have again reviewed Agent Hayes's affidavit in support of the warrant application and find that it contained sufficiently ripe information that Cruz unlawfully possessed firearms and was involved in substantial narcotics trafficking from 54 Joseph Place. Indeed, the affidavit states that from October 2003 up until April 7, 2004, the day before the warrant was issued, Hayes received information from several known and reliable confidential informants which corroborated his belief that Cruz was involved in firearm and narcotics trafficking at the Joseph Place residence. See, e.g., United States v. Miles, 2006 WL 2403464, *5 (W.D.N.Y. Aug. 18, 2006)(search warrant was supported by probable cause where confidential informant had personal knowledge of criminal activity which occurred in temporal proximity to warrant application).

That the factual allegations in Hayes's affidavit span several years does not undermine the existence of probable cause, but only serves to demonstrate the ongoing nature of the trafficking scheme. "Where a supporting affidavit presents a picture of continuing

conduct as opposed to an isolated instance of wrongdoing . . . the passage of time between the last described act and the presentation of the application become less significant." United States v. Diaz, 176 F.3d 52, 109 (2d Cir. 1999)(internal quotation marks and citation omitted). This is "especially true in a case involving an ongoing narcotics operation, where 'intervals of weeks or months between the last described act and the application' for a wiretap do not necessarily make the information stale." Id., quoting Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991). See also United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990)(holding that gap of 18 months did not render information stale).

Even assuming for the sake of argument that the warrant application was not supported by "ripe" probable cause, "suppression of evidence obtained pursuant to a search warrant is an appropriate remedy only if law enforcement's reliance upon the search warrant was objectively unreasonable, i.e., the officer lacked objective good faith in the validity of the warrant." United States v. Miles, 2006 WL 2403464, *5 (W.D.N.Y. Aug. 18, 2006). Here, there simply is no basis for this Court to find anything other than that the officers had an objective good faith basis to rely on the search warrant I issued. United States v. Leon, 468 U.S. 897 (1984). Accordingly, the remedy of suppression is not warranted.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motions to suppress be **denied.**

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE

Dated:      December **IS** , 2006
            Rochester, New York

20

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R. Civ.P. 72(b) and Local Rule 72.3(a)(3).[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this order and a copy of the Report and Recommendation to the attorneys for the Government and the Defendant.
**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated: December **15**, 2006
Rochester, New York

_____

[4] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. §3161(h)(1)(f) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. <u>United States v. Andress</u>, 943 F.2d 622 (6th Cir. 1991); <u>United States v. Long</u>, 900 F.2d 1270 (8th Cir. 1990).